## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| BOARD OF TRUSTEES OF THE IBT LOCAL 863 PENSION FUND,<br><br>       Plaintiff,<br><br>v.<br><br>C&S WHOLESALE GROCERS INC. / WOODBRIDGE LOGISTICS LLC,<br><br>       Defendant. | Civil Action No. 12-7823 (JLL) (JAD)<br><br>**OPINION** |

**LINARES,** District Judge.

This matter comes before the Court by way of Plaintiff the Board of Trustees of the IBT Local 863 Pension Fund (the "Board") and Defendant C&S Wholesale Grocers, Inc./Woodbridge Logistics, LLC ("Woodbridge")'s cross motions for summary judgment pursuant to Federal Rule of Civil Procedure 56. (Pl.'s Mot. for Summ. J., ECF No. 33; Def.'s Mot. for Summ. J., ECF No. 34). The Court has considered the parties' submissions in support of and in opposition to the instant motions and decides this matter without oral argument pursuant to Federal Rule of Civil Procedure 78. For the reasons set forth below, the Board's motion is GRANTED in part and DENIED in part. Likewise, Woodbridge's motion is GRANTED in part and DENIED in part.

## I.     BACKGROUND

This case centers on a dispute over the proper interpretation of section 4219(c)(1)(C)(i) of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1399(c)(1)(C)(i). In brief, that section provides a formula for calculating an employer's annual payment to a multiemployer pension plan after its withdrawal from the plan. The parties offer

conflicting meanings of one of the two variables in that formula, "the highest contribution rate." The Court must now decide which meaning is correct. As it is impossible to understand this case without some background on ERISA, the Court begins with an overview of ERISA's statutory framework.

> A.    <u>ERISA's Statutory Framework</u>

ERISA is a comprehensive statute that regulates employee retirement plans. *See generally* 29 U.S.C. § 1001 *et seq.* Congress enacted ERISA to ensure that "if a worker has been promised a defined pension benefit upon retirement—and if he has fulfilled whatever conditions are required to obtain a vested benefit—he actually will receive it." *Nachman Corp. v. Pension Benifit Guar. Corp.*, 446 U.S. 359, 375 (1980). Among the types of employee retirement plans that ERISA regulates are multiemployer pension plans, "in which multiple employers pool contributions into a single fund that pays benefits to covered retirees who spent a certain amount of time working for one or more of the contributing employers." *Trs. of the Local 138 Pension Trust Fund v. F.W. Honerkamp Co. Inc.*, 692 F.3d 127, 129 (2d Cir. 2012). In order to combat threats to the solvency of multiemployer pension plans, Congress amended ERISA by enacting the Multiemployer Pension Plan Amendments Act of 1980 (the "MPPAA"), Pub. L. No. 96-364, 94 Stat. 1208, and the Pension Protection Act of 2006 (the "PPA"), Pub. L. No. 109-280, 120 Stat. 780.

> 1.    <u>The MPPAA</u>

The MPPAA added sections 4201 through 4225 to ERISA. 29 U.S.C. §§ 1381–1405. Before Congress passed the MPPAA, employers had a strong incentive to withdraw from multiemployer pension plans experiencing financial difficulties. *See Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Trust for S. Cal.*, 508 U.S. 602, 608 (1993) (explaining

why Congress passed the MPPAA). The MPPAA eliminates this incentive, in part, by requiring

an employer who effects a "complete withdrawal" from a multiemployer pension plan to pay

"withdrawal liability" payments. 29 U.S.C. § 1381(a). This "insures that [the withdrawing

employer's] financial burden will not be shifted to the remaining employers" in the plan.

*SUPERVALU, Inc. v. Bd. Of Trs. Of Sw. Pa. & W. Md. Area Teamsters & Employers Pension

Fund*, 500 F.3d 334, 337 (3d Cir. 2007) (citation omitted). A "complete withdrawal" occurs

when an employer either "permanently ceases to have an obligation to contribute under the

plan," or "permanently ceases all covered operations under the plan." 29 U.S.C. § 1383(a).

When an employer completely withdrawals from a multiemployer pension plan, the "plan

sponsor," *i.e.*, its board of trustees,[1] must notify the employer of the amount of the withdrawal

liability. 29 U.S.C. §§ 1382, 1399(b)(1).

In essence, the amount of an employer's "withdrawal liability" is its proportionate share

of the multiemployer pension plan's unfunded vested benefits, or its "allocable amount of

unfunded vested benefits." *See* 29 U.S.C. § 1381(b). "Unfunded vested benefits are 'calculated

as the difference between the present value of vested benefits and the current value of the plan's

assets.' " *In re Marcal Paper Mills, Inc.*, 650 F.3d 311, 316 (3d Cir. 2011) (quoting *Pension

Benefit Guar. Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 725 (1984)). ERISA section 4211

provides various methods for calculating an employer's allocable amount of unfunded vested

benefits. *See* 29 U.S.C. § 1391(c)(1). After calculating the withdrawing employer's allocable

amount of unfunded vested benefits based on the applicable method, the plan's board must then

prepare a schedule for liability payments. 29 U.S.C. §§ 1382, 1399(b)(1).

---

[1] For purposes of ERISA, the term "plan sponsor" means, among other things, the board of trustees who establish or maintain an employee pension plan. 29 U.S.C. § 1002(16)(B).

3

Such liability payments, pursuant to ERISA section 4219(c), are made to the plan annually in level amounts. 29 U.S.C. § 1399(c). ERISA section 4219(c)(1)(C)(i) provides that the amount of each annual payment is the product of:

> (I) the average annual number of contribution base units for the period of 3 consecutive plan years, during the period of 10 consecutive plan years ending before the plan year in which the withdrawal occurs, in which the number of contribution base units for which the employer had an obligation to contribute under the plan is the highest, and

> (II) the highest contribution rate at which the employer had an obligation to contribute under the plan during the 10 plan years ending with the plan year in which the withdrawal occurs.

29 U.S.C. § 1399(c)(1)(C)(i). Notably, ERISA section 4219(c)(1)(B) "limits the employer's obligation to make these payments to [twenty] years, even if it would take more than [twenty] payments for the employer to pay its full withdrawal liability." *Trs. of the Local 138 Pension Fund*, 692 F.3d at 130 (citations omitted). Once the plan's board has made the necessary calculations under ERISA sections 4211 and 4219, the board must demand payment in accordance with the schedule for withdrawal liability payments. 29 U.S.C. §§ 1382, 1399(b)(1).

  2. The PPA

"[T]he PPA includes measures designed to protect and restore multiemployer pension plans in danger of being unable to meet their pension distribution obligations in the near future." *Trs. of the Local 138 Pension Fund*, 692 F.3d at 130. Such measures include the imposition of an "automatic employer surcharge" if a multiemployer pension plan falls into "critical status," *i.e.*, if the plan is less than sixty-five percent funded. 29 U.S.C. § 1085. For the first year that the plan is in critical status, ERISA section 305(e)(7)(A) provides that the automatic employer surcharge is "equal to [five] percent of the contributions otherwise required under the applicable collective bargaining agreement [("CBA")] (or other agreement pursuant to which the employer

4

contributes)." 29 U.S.C. § 1085(e)(7)(A).  That section also provides that for each succeeding

year that the plan remains in critical status, the surcharge is equal to ten percent.  29 U.S.C. §

1085(e)(7)(A).

ERISA section 305(e)(7)(B) provides that such automatic employer surcharges are "due

and payable on the same schedule as the contributions on which the surcharges are based."  29

U.S.C. § 1085(e)(7)(B).  Furthermore, under that section, any failure to make an automatic

employer surcharge payment is "treated as a delinquent contribution under [ERISA section 515,

29 U.S.C. § 1145,]" and is "enforceable as such."  29 U.S.C. § 1085(e)(7)(B).

To the extent that ERISA addresses whether automatic employer surcharges are included

in a withdrawing employer's withdrawal liability, ERISA section 305(e)(9)(B) provides:

> Any [automatic employer surcharges] shall be disregarded in
> determining the allocation of unfunded vested benefits to an
> employer under [ERISA section 4211, 29 U.S.C. § 1391,] except
> for purposes of determining the unfunded vested benefits
> attributable to an employer under [ERISA section 4211(c)(4), 29
> U.S.C. § 1391(c)(4),] or a comparable method approved under
> [ERISA section 4211(c)(5), 29 U.S.C. § 1395(c)(5).]"

29 U.S.C. § 1085(e)(9)(B).  ERISA does not explicitly address whether the board of trustees of a

multiemployer pension plan should include automatic employer surcharges in the board's

calculation of a withdrawing employer's annual withdrawal liability payment pursuant to ERISA

section 4219(c)(1)(C)(i).

B.    Woodbridge's Complete Withdrawal From the IBT Local 863 Pension Fund

In February 2011, Defendant Woodbridge effected a "complete withdrawal" from the

IBT Local 863 Pension Fund (the "Fund"), a multiemployer pension plan, when it closed its

Northern New Jersey facilities.  (Def.'s 56.1 Stmt. ¶ 5, ECF No. 35-1; Pl.'s Resp. 56.1 Stmt. ¶ 5,

ECF No. 38-1).  At that time, Woodbridge was a party to three CBAs with the IBT Local 863

union that are relevant to this action:  (1) the Warehouse CBA; (2) the Mechanics' CBA; and (3) the Porters' CBA.  (Def.'s 56.1 Stmt. ¶ 1; Pl.'s Resp. 56.1 Stmt. ¶ 1; Markey Decl. Ex. C, ECF No. 35-4; Markey Decl. Ex. D, ECF No. 35-5; Markey Decl. Ex. E, ECF No. 35-6).

The three CBAs required Woodbridge to contribute to the Fund for every hour worked by each covered employee, with the hourly contribution rate hinging on the covered employee's classification.  (Def.'s 56.1 Stmt. ¶¶ 1-2; Pl.'s Resp. 56.1 Stmt. ¶¶ 1-2).  The hourly contribution rates under the three CBAs ranged from $1.50 to $3.69 per hour when Woodbridge withdrew from the Fund in February 2011.  (Def.'s 56.1 Stmt. ¶ 2; Pl.'s Resp. 56.1 Stmt. ¶ 2).  At that time, the Fund had been in "critical status" since the plan year beginning on September 1, 2008.[2] (Def.'s 56.1 Stmt. ¶ 3; Pl.'s Resp. 56.1 Stmt.¶ 3).  As a result, Woodbridge had paid ten percent automatic surcharges on its contributions to the Fund for roughly two years before it closed its Northern New Jersey facilities.  (See Def.'s 56.1 Stmt. ¶¶ 3-4; Pl.'s Resp. 56.1 Stmt. ¶¶ 3-4).

C.   The Board's Calculation of Woodbridge's Withdrawal Liability

The Board is responsible for generally administering the Fund and for carrying out the provisions set forth in the Local Union No. 863 I.B.T. Restated Pension Plan.  (Markey Decl. Ex. B Art. VI, Sec. 6.01, ECF No. 35-3).  Because Woodbridge effected a complete withdrawal from the Fund in February 2011, the Board had to perform two calculations.  See 29 U.S.C. §§ 1382, 1399(b)(1).  First, the Board had to calculate the amount of Woodbridge's allocable amount of unfunded vested benefits under ERISA section 4211(c)(3). 29 U.S.C. § 1391(c)(3); (Markey Decl. Ex. B Art. XII, Sec. 12.03).  Second, the Board had to calculate Woodbridge's annual withdrawal liability payment under ERISA section 4219(c)(1)(C)(i).

---

[2] In other words, the Fund had been less than sixty-five percent funded since the plan year beginning on September 1, 2008.  See 29 U.S.C. § 1085(b)(2) (noting that a multiemployer pension plan is in "critical status" when it is less than sixty-five percent funded).

6

The Board's actuary, the Segal Company ("Segal"), performed the two required calculations. (Def.'s 56.1 Stmt. ¶ 6; Pl.'s Resp. 56.1 Stmt. ¶ 6). First, Segal calculated Woodbridge's allocable amount of unfunded vested benefits to be $189,606,875. (Def.'s 56.1 Stmt. ¶ 6; Pl.'s Resp. 56.1 Stmt. ¶ 6). Second, Segal calculated Woodbridge's required annual withdrawal liability payment to be $8,553,551. (Def.'s 56.1 Stmt. ¶ 8, Pl.'s Resp. 56.1 Stmt. ¶ 8). Even at that annual rate, a portion of Woodbridge's allocable amount of unfunded vested benefits would remain unpaid after twenty years. (*See* Def.'s 56.1 Stmt. ¶ 10; Pl.'s Resp. 56.1 Stmt. ¶ 10). Nonetheless, pursuant to ERISA section 4219(c)(1)(B), Woodbridge would only have to pay $8,553,551 annually for twenty years.[3] (Def.'s 56.1 Stmt. ¶ 10; Pl.'s Resp. 56.1 Stmt. ¶ 10).

In a demand letter dated April 29, 2011, the Board notified Woodbridge of its allocable amount of unfunded vested benefits and its withdrawal liability payment schedule, as required by ERISA section 4219(b)(1), 29 U.S.C. § 1399(b)(1). (*See* Def.'s 56.1 Stmt. ¶ 9; Pl.'s Resp. 56.1 Stmt. ¶ 9). The demand letter requested that Woodbridge make either eighty quarterly payments of $2,138,387.75, or a single lump sum payment of $91,249,616. (Def.'s 56.1 Stmt. ¶ 9; Pl.'s Resp. 56.1 Stmt. ¶ 9). The lump sum payment calculation reflected Segal's present value calculation of the withdrawal liability payments that the Fund would collect over the course of eighty quarters, or twenty years. (Def.'s 56.1 Stmt. ¶ 9; Pl.'s Resp. 56.1 Stmt. ¶ 9).

The parties do not dispute that Segal properly calculated Woodbridge's allocable amount of unfunded vested benefits. (Def.'s 56.1 Stmt. ¶ 6; Pl.'s Resp. 56.1 Stmt. ¶ 6). Instead, they dispute whether Segal properly calculated Woodbridge's required annual withdrawal liability payment under ERISA section 4219(c)(1)(C)(i). In calculating "the highest contribution rate at

---

[3] ERISA "forgives all debt outstanding after 20 years . . . ." *Milwaukee Brewery Workers' Pension Plan v. Jos. Schlitz Brewing Co.*, 513 U.S. 414, 419 (1995) (citing ERISA section 4219(c)(1)(B), 29 U.S.C. § 1399(c)(1)(B)).

which the employer had an obligation to contribute under the plan during the 10 plan years

ending with the plan year in which the withdrawal occurs," Segal first determined that the single

"highest contribution rate" that Woodbridge paid to the Fund across all of its CBAs with the

Fund was $3.69 per hour.  (Def.'s 56.1 Stmt. ¶ 8; Pl.'s Resp. 56.1 Stmt. ¶ 8).  Segal then added

the ten percent automatic employer surcharge to that hourly rate, and, thereby, concluded that

Woodbridge's highest contribution rate was $4.06 per hour.  (Def.'s 56.1 Stmt. ¶ 8; Pl.'s Resp.

56.1 Stmt. ¶ 8).  Using that rate, Segal determined that Woodbridge's required annual payment is

$8,553,551.  (Def.'s 56.1 Stmt. ¶ 8; Pl.'s Resp. 56.1 Stmt. ¶ 8).  Disagreeing with Segal's

methodology, specifically, Segal's interpretation of the phrase "the highest contribution rate,"

Woodbridge demanded arbitration pursuant to ERISA section 4221, 29 U.S.C. § 1401.  (*See*

Def.'s 56.1 Stmt. ¶ 14; Pl.'s Resp. 56.1 Stmt. ¶ 14).

 D. The Arbitration

 The parties eventually submitted two issues—entirely through briefs—to the arbitrator,

Mark L. Irvings (the "Arbitrator"):

> (1) Did the Fund comply with ERISA Section 4219(c)(1)(C) and
> the regulations promulgated thereunder when it calculated
> Woodbridge's withdrawal liability payment schedule by taking
> into account the highest contribution rate at which Woodbridge
> was obligated to contribute to the Fund, notwithstanding the fact
> that the last bargaining agreements in effect allowed lower
> contribution rates for some employee classifications?

> (2) Is the Fund's inclusion of Woodbridge's [automatic] surcharges
> in the calculation of the contribution rate used to determine
> Woodbridge's withdrawal liability payment schedule permissible
> under ERISA?

(Markey Decl. Ex. F 1, ECF No. 35-7).  On November 21, 2012, the Arbitrator issued an

Opinion and Award resolving the first issue in favor of Woodbridge, and the second issue in

favor of the Board.  (*Id.* at 21).  The Court now summarizes the parties' positions and the reasoning behind the Arbitrator's Opinion and Award as to each issue.

       1.     <u>Did the Board's Calculation of Woodbridge's Highest Contribution Rate, Which Used the Single Highest Contribution Rate Across Multiple CBAs, Comply With ERISA Section 4219(c)(1)(C)(i)(II)?</u>

With regard to the first issue, Woodbridge argued that Segal "improperly used $3.69 as the [highest contribution rate], which was just one of numerous contribution rates provided for in three different [CBAs], despite the fact that contributions had been made at this level for a very small segment of [Woodbridge's] workforce." (*Id.* at 7-8).  In support of this argument, Woodbridge maintained that the purpose of ERISA section 4219(c)(1)(C)(i)(II) "is to approximate the highest level of contributions made by the employer during the ten plan years preceding the withdrawal." (*Id.* at 8).  According to Woodbridge, Segal's methodology undermined this purpose because it arrived at an annual payment of $8,553,551, an amount that greatly exceeds Woodbridge's previous highest annual payment of $5,777,708.  (*Id.*).

Woodbridge proposed two alternative methodologies for calculating the highest contribution rate that it considered to be consistent with the purpose of ERISA section 4219(c)(1)(C)(i)(II).  (*Id.* at 8-9).  Either Segal should have used "the weighted average highest hourly contribution rate under the three [CBAs] during the relevant ten year period," or "it should have computed the highest rate applicable to each group of employees under each contract, multiplied by the highest three year [contribution base unit] for each group." (*Id.*).

In response, the Board contended that Segal "applied the clear and explicit literal terms of [ERISA section 4219(c)(1)(C)(i)(II)], there being no dispute that the highest contribution rate provided for under [Woodbridge's CBAs] in the relevant time period was $3.69." (*Id.* at 12).  The Board emphasized that "Congress could have established a mechanism for averaging

multiple contribution rates provided for in a [CBA], but it chose not to." (*Id.*).  The Board contended that, at bottom,  acceptance of Woodbridge's position would require the Arbitrator to rewrite the clear statutory language of ERISA section 4219(c)(1)(C)(i)(II).  (*Id.*).

The Arbitrator disagreed with the Board's contention that the text of ERISA section 4219(c)(1)(C)(i)(II) explicitly required the use of Segal's methodology.  (*See id.* at 15).  The Arbitrator explained that "[if] the section read 'the highest contribution rate at which the employer had an obligation to contribute under any of its [CBAs,]' the [Board] would be correct." (*Id.*).  Because the Arbitrator considered the language of ERISA section 4219(c)(1)(C)(i)(II) to be ambiguous, he consulted both its legislative history and a related interpretation of that language provided by the Pension Benefit Guaranty Corporation (the "PBGC").  (*Id.* at 15-18).  The Arbitrator ultimately concluded that the Board should adopt the following approach:

> [T]he [Board] should compute the highest three year average contribution base units for each contribution rate group under each of the three [CBAs], and then multiply each of those totals by the [highest contribution rate]—the rate in effect during the last year of the [CBAs]—applicable to each group.  This classification-by-classification method is how the Fund collected contributions, and it is how the [Board] should compute the annual payments.  Such an approach complies with the language of Subsection (i)(II) mandating that multiplier be the 'highest contribution rate at which the employer had an obligation to contribute under the plan.'

(*Id.* at 18-19).

### 2. Did the Board's Inclusion of the Automatic Employer Surcharge in its Calculation of Woodbridge's "Highest Contribution Rate" Comply With ERISA Section 4219?

With regard to the second issue, Woodbridge argued that the phrase "the highest contribution rate at which the employer had an obligation to contribute under the plan" does not include automatic employer surcharges for two main reasons. (*Id.* at 9-11).

First, Woodbridge noted that the term "obligation to contribute" is defined by ERISA section 4212(a) as any such obligation arising "(1) under one or more collective bargaining (or related) agreements, or (2) as a result of a duty under applicable labor-management relations law . . . ."  29 U.S.C. § 1392(a); (Markey Decl. Ex. F 9-10).  Woodbridge then argued that because its obligation to pay automatic surcharges did not arise under either the CBAs or applicable labor-management relations law—it instead arose under ERISA—"the highest contribution rate" does not include such surcharges.  (Markey Decl. Ex. F 10).

Second, Woodbridge argued that since ERISA distinguishes between surcharges and contributions, "the highest contribution rate" does not include surcharges.  (*Id.*).  In support of this argument, Woodbridge referred to ERISA section 305(e)(7)(B), which provides:

> [Automatic Employer Surcharges] shall be due and payable on the same schedule as the contributions on which the surcharges are based.  Any failure to make a surcharge payment shall be treated as a delinquent contribution under [ERISA section 515, 29 U.S.C. § 1145,] and shall be enforceable as such.

29 U.S.C. § 1085(e)(7)(B).  If surcharges and contributions are the same under ERISA, Woodbridge asked, then why did Congress even bother drafting ERISA section 305(e)(7)(B)? (Markey Decl. Ex. F 10).  Woodbridge also argued that "[b]asing the surcharges on contributions, and treating them as delinquent contributions if unpaid, is not the same thing as defining surcharges as contributions."  (*Id.*).

The Board drew the opposite conclusion from ERISA section 305(e)(7)(B), arguing that "[a]bsent some other statutory section precluding the inclusion of the surcharge as part of the [highest contribution rate], the surcharge must be recognized as one component of the [highest contribution rate]."  (*Id.* at 14).  The Board also argued that ERISA section 305(e)(9)(B) supports its position.  (*Id.*).  That section states, generally, that automatic employer surcharges "shall be

disregarded in determining the allocation of unfunded vested benefits to an employer under [ERISA section 4211, 29 U.S.C. § 1391] . . . ." 29 U.S.C. § 1085(e)(9)(B).  The Board found it "noteworthy that Congress did not provide for a parallel exclusion from the determination of the [highest contribution rate] . . . ." (Markey Decl. Ex. F 14).  The Board also emphasized that before Congress amended ERISA section 305(e)(9)(B) in 2008, that section stated that automatic employer surcharges "shall be disregarded in determining an employer's annual withdrawal liability under [ERISA section 4211]." (*Id.*).  The Board asserted that "[h]ad Congress intended to exclude the use of the surcharge when computing any portion of the withdrawal liability payment schedule it could have done so, but instead it removed any ambiguity by expressly limiting the exclusion to the allocation of unfunded vested benefits." (*Id.*).  Woodbridge countered that "the fact that Congress specifically chose to exclude surcharges from the computation of withdrawal liability cannot be interpreted as meaning it intended to include surcharges in the unrelated calculation of the payment schedule." (*Id.* at 11).

The Arbitrator ultimately concluded that surcharges are included in the "highest contribution rate." (*Id.* at 19-20).  The Arbitrator reasoned that ERISA section 305(e)(7)(B)'s statement that surcharges are "*treated as delinquent contributions* means surcharges are contributions . . . ." (*Id.* at 19 (emphasis in original)).  The Arbitrator also reasoned that ERISA section 305(e)(9)(B) reinforced the conclusion that surcharges paid by Woodbridge should be included in the highest contribution rate by negative implication. (*Id.* at 20).

E.    Procedural History

Both parties filed actions in this Court seeking review of the Arbitrator's Opinion and Award on December 21, 2012.  The Court subsequently consolidated their cases into this one

action, which the Court has jurisdiction over pursuant to ERISA sections 4212 and 4301, 29

U.S.C. §§ 1392, 1401.

## II.    LEGAL STANDARD

Summary judgment is appropriate when, drawing all reasonable inferences in the non-

movant's favor, there exists no "genuine dispute as to any material fact" and the movant is

entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby,*

*Inc.,* 477 U.S. 242, 255 (1986).  The moving party is entitled to judgment as a matter of law

when the non-moving party fails to make "a sufficient showing on an essential element of her

case with respect to which she has the burden of proof."  *Celotex Corp. v. Catrett*, 477 U.S. 317,

323 (1986).  The Court must, however, consider all facts and their reasonable inferences in the

light most favorable to the non-moving party.  *See Pennsylvania Coal Ass'n v. Babbitt*, 63 F.3d

231, 236 (3d Cir. 1995).   If a reasonable juror could return a verdict for the non-moving party

regarding material disputed factual issues, summary judgment is not appropriate.  *See Anderson*,

477 U.S. at 242-43 ("At the summary judgment stage, the trial judge's function is not himself to

weigh the evidence and determine the truth of the matter but to determine whether there is a

genuine issue for trial.").

On a motion for summary judgment in a case arising from a MPPAA arbitration, "[t]he

arbitrator's legal conclusions are reviewed *de novo*."  *Crown Cork & Seal Co. v. Cent. States Se.*

*& Sw. Areas Pension Fund*, 982 F.2d 857, 860 (3d Cir. 1992) (citation omitted).  Additionally, in

such cases, it is "presume[d] that the arbitrator's factual findings are correct unless they are

rebutted by a clear preponderance of the evidence."  *Id.* (citations omitted).

## III.   DISCUSSION

The two questions presented to this Court are the same as those presented to the Arbitrator.  The resolution of both questions hinges on the meaning of the phrase "the highest contribution rate at which the employer had an obligation to contribute under the plan" in ERISA section 4219(c)(1)(C)(i)(II), 29 U.S.C. § 1399(c)(1)(C)(i)(II).  The first question is whether that phrase refers to the absolute highest rate at which an employer had an obligation to contribute under a multiemployer pension plan.  The second question is whether a multiemployer pension plan should include automatic employer surcharges in its calculation of the "highest contribution rate at which the employer had an obligation to contribute under the plan."  The Court now addresses each question in turn.

### A.   Whether the Phrase "the Highest Contribution Rate" in ERISA Section 4219(c)(1)(C)(i)(II) Refers to the Absolute Highest Rate at Which an Employer Had an Obligation to Contribute Under a Multiemployer Pension Plan?

The first step a court must take when interpreting statutory language  " 'is to determine whether the language at issue has a plain and unambiguous meaning.' "  *Register v. PNC Fin. Servs. Grp., Inc.*, 477 F.3d 56, 67 (3d Cir. 2007) (quoting *Dobrek v. Phelan*, 419 F.3d 259, 263 (3d Cir. 2005), and applying the canon to ERISA).  In taking that first step, a court must read the statutory language "in its ordinary and natural sense," *Harvard Secured Creditors Liquidation Trust v. I.R.S.*, 568 F.3d 444, 451 (3d Cir. 2009) (quotation marks and citation omitted), and "in the context of the entire statute."  *Byrd v. Shannon*, 715 F.3d 117, 123 (3d Cir. 2013) (citations omitted); *see also United States v. Tupone*, 442 F.3d 145, 151 (3d Cir. 2006) ("The Supreme Court has stated consistently that the text of a statute must be considered in the larger context or structure of the statute in which it is found.").  This first step is observed for all statutory language, including language in ERISA, " '[b]ecause it is presumed that Congress expresses its

14

intent through the ordinary meaning of its language . . . ." *Register*, 477 F.3d at 67 (quoting *Rosenberg v. XM Ventures*, 274 F.3d 137, 141 (3d Cir. 2001)).

"Where the statutory language, on examination of 'the language itself, the specific context in which that language is used, and the broader context of the statute as a whole' is plain and unambiguous, further inquiry is not required." *Id.* (quoting *Rosenberg*, 274 F.3d at 141). Thus, in such instances, a court should not take the additional steps of considering an agency's interpretation of statutory language, legislative history, or general policy objectives. *See Hagans v. Comm'r of Soc. Sec.*, 694 F.3d 287, 295 (3d Cir. 2012) (citation omitted) ("[W]e need reach the deference question *only* if we find the statutory language is ambiguous."); *In re Phila. Newspapers, LLC*, 599 F.3d 298, 304 (3d Cir. 2010) ("Where the statutory language is unambiguous, the court should not consider statutory purpose or legislative history."); *see also Fogelman v. Mercy Hosp., Inc.*, 283 F.3d 561, 569 (3d Cir. 2002) (citation omitted) (noting that, in general, conflicts "between a statute's plain meaning and its general policy objectives . . . ought to be resolved in favor of the statute's plain meaning."). Notably, a statute's language "is ambiguous only where the disputed language is 'reasonably susceptible of different interpretations.' " *In re Phila Newspapers, LLC*, 599 F.3d at 304 (quoting *Nat'l R.R. Passenger Corp. v. Atchinson Topeka & Santa Fe Ry. Co.*, 470 U.S. 451, 473 n. 27 (1985)).

At issue here is the meaning of the phrase "the highest contribution rate at which the employer had an obligation to contribute under the plan" in ERISA section 4219(c)(1)(C)(i)(II), 29 U.S.C. § 1399(c)(1)(C)(i)(II).  On the one hand, the Board contends that the plain meaning of that phrase is "clear and unambiguous." (Pl. Br. 13, ECF No. 33-4).  That phrase, according to the Board, "means precisely what it says.  Hence, where multiple contribution rates are contained in one or more [CBAs], only the highest rate among them is taken into account by the formula."

(*Id.* at 4). The Board maintains that "[t]here are no words in [ERISA section 4219(c)(1)(C)(i)(II)] that support the notion that a fund is to use multiple rates or consider various employee classifications." (*Id.* at 14). Indeed, the Board argues that by providing for the use of the "highest rate," Congress certainly recognized that an employer could be subject to more than one rate. (*Id.* at 13-14). But the Board argues that Congress's "use of the singular 'rate' manifests an intent to use a single rate," as opposed to multiple rates. (*Id.* at 13).

On the other hand, Woodbridge contends that ERISA section 4219(c)(1)(C)(i)(II) is ambiguous. (*See* Def. Br. 11-13, ECF No. 34-1). In support, Woodbridge quotes the following portion of the Arbitrator's decision:

> [T]he import of Section 4219(c)(1)(C) is not patently obvious from a literal reading of the provision. If the section read 'the highest contribution rate at which the employer had an obligation to contribute under any of its [CBAs]' the [Board] would be correct. Such language would reflect a reality that Congress had considered the circumstances presented in this case and concluded that the policy of collecting as much money as possible from a withdrawing employer was paramount, even if this meant the payment schedule was based on a contribution rate that previously applied to a small fraction of the total workforce.

(*Id.* at 13). Relatedly, Woodbridge argues that the Board's reading of ERISA section 4219(c)(1)(C)(i)(II) leads to an absurd result because it would require Woodbridge to pay an annual payment for the next twenty years that greatly exceeds its previous maximum annual payment. (*Id.* at 20). Woodbridge asks this Court to order the Board to recalculate the amount of Woodbridge's annual payment in accordance with the method the Arbitrator set forth in his Opinion and Award. (*Id.* at 10-11). This method, according to Woodbridge, is supported by ERISA section 4219(c)(1)(C)(i)'s statutory purpose, the legislative history, and a PBGC opinion letter. (*See id.* at 14-22).

16

     The Court need not consult ERISA section 4219(c)(1)(C)(i)'s alleged statutory purpose, legislative history,[4] or the PBGC opinion letter,[5] however, since the statutory language is plain and unambiguous. *Register*, 477 F.3d at 67 (noting that "further inquiry is not required" where statutory language is "plain and unambiguous"). In other words, it is not "reasonably susceptible of different interpretations." *Nat'l R.R. Passenger Corp.*, 470 U.S. at 473 n. 27. Congress could

---

[4] The Court is unpersuaded by Woodbridge's suggestion in its Reply Brief that this Court should refer to the legislative history because this case, like *Morgan v. Gay*, is among the "rare instance[s] where it is uncontested that legislative intent is at odds with the literal terms of the statute . . . ." 466 F.3d 276, 278 (3d Cir. 2006). In *Morgan*, the Third Circuit read "not less than 7 days" as "not more than 7 days" in a section of the Class Action Fairness Act, where "the uncontested legislative intent behind [that section] was to impose a seven-day deadline for appeals" from remand orders. *Id.* at 277. In its analysis, the Third Circuit cautioned that "[a]s a point of fact, there can be multiple legislative intents because hundreds of men and women must vote in favor of a bill in order for it to become a law." *Id.* at 278 (citing Caleb Nelson, *What is Textualism?*, 91 Va. L. Rev. 347, 370 (2005)). Yet, with regard to the section of the Act at issue in *Morgan*, there was just one legislative intent: the "*uncontested* intent of Congress" to establish a seven-day deadline rather than a waiting period. 466 F.3d at 279 (emphasis in original). Here, however, there are apparently multiple legislative intents. For instance, Woodbridge cites to a House Report from the Committee on Education and Labor stating that Congress designed the annual payment rules "to provide for continued funding by the withdrawn employer in line with its previous contributions so as to make the liability an annual business cost." H. R. Rep. No. 96-869(I), at 83 (1980). Yet, that same House Report elsewhere states that the policies underlying the MPPAA are "(1) to protect the interests of participants and beneficiaries in financially distressed multiemployer plans, and (2) to encourage the growth and maintenance of multiemployer plans in order to ensure benefit security to plan participants." *Id.* at 71. Presumably, maximizing an employer's annual withdraw payments would further these two policies, and congressmen may have voted to pass the MPPAA with this goal in mind. Since the Supreme Court has remarked that "[r]eliance on . . . isolated fragments of legislative history in divining the intent of Congress is an exercise fraught with hazards, and 'a step to be taken cautiously,' " the Court declines to take that step here. *New England Power Co. v. New Hampshire*, 455 U.S. 331, 342 (1982) (quoting *Piper v. Chris-Craft Indus., Inc.*, 430 U.S. 1, 26 (1977)).

[5] Even if the language of ERISA section 4219(c)(1)(C)(i) were ambiguous, PBGC Opinion Letter 90-2 would be entitled to, at most, the degree of deference called for by *Skidmore v. Swift*, 323 U.S. 134 (1944). *See Lawrence v. City of Phila.*, 527 F.3d 299, 316 n. 6 (3d Cir. 2008) (noting that interpretations in opinion letters are entitled to, at most, *Skidmore* deference). In other words, PBGC Opinion Letter 90-2 would be " 'entitled to respect' . . . to the extent that [it has] the 'power to persuade.' " *Christiansen v. Harris Cty.*, 529 U.S. 576, 587 (2000) (quoting *Skidmore*, 323 U.S. 134, 140 (1944)). In that letter, the PBGC opined that under ERISA section 4219(c)(1)(C)(i), the board of trustees of a multiemployer pension plan *could*, at its volition, calculate the amount of an employer's annual withdrawal liability payment on a contract-by-contract basis rather than using a cumulative approach. However, the PBGC did not opine that an alternative approach could be forced on a board against its will. *See* PBGC Opinion Letter 90-2 (April 20, 1990). Here, the Board has opted not to adopt the classification-by-classification approach the Arbitrator proposed, and this Court is not persuaded that it should now force this approach on the Board merely because the PBGC opined that "the purpose of the annual payment provision is to have the annual payment of withdrawal liability approximate the highest level of contributions made by the employer during the ten plan years preceding the withdrawal." *Id.*

have drafted ERISA section 4219(c)(1)(C)(i)(II) to provide for the classification-by-classification method the Arbitrator proposed, but Congress did not do so.  Instead, Congress drafted that section to read "the highest contribution rate at which the employer had an obligation to contribute under the plan." 29 U.S.C. § 1399(c)(1)(C)(i)(II).

What is more, Congress also drafted a definition for the term "obligation to contribute" in ERISA section 4212(a), which provides:

> For purposes of this part,[6] the term 'obligation to contribute' means an obligation to contribute arising—
>
>> (1) under one or more collective bargaining (or related) agreements, or
>>
>> (2) as a result of a duty under applicable labor-management relations law, but
>
> does not include an obligation to pay withdrawal liability under this section or to pay delinquent contributions.

29 U.S.C. § 1392(a).  That definition controls here. *Laborers Health & Welfare Trust Fund for N. Cal. v. Advanced Lightweight Concrete Co., Inc.*, 484 U.S. 539, 545-46 (1988) (observing that the term "obligation to contribute" is "defined for the purposes of the withdrawal liability portion of the statute in language that unambiguously includes both the employer's contractual obligations and any obligation imposed by the NLRA," which the Supreme Court equated with "applicable labor-management relations law."); *see also Hanif v. Attorney Gen. of the United States*, 694 F.3d 479, 484 (3d Cir. 2012) (citations omitted) (noting that when Congress uses specific terms defined elsewhere in a statute, "[a]bsent any indication to the contrary, we must presume that Congress intended to give those terms the meaning ascribed to them . . . .").

---

[6] ERISA sections 4212(a) and 4219(c)(1)(C)(i) appear in the same part of the statute, added by the MPPAA, titled "Employer Withdrawals."

Read together, ERISA sections 4212(a) and 4219(c)(1)(C)(i)(II) call for the use of the single "highest contribution rate" at which the employer had an obligation to contribute arising under "one or more" CBAs under the plan. The two sections do not call for the use of multiple contribution rates. Thus, the phrase "the highest contribution *rate*" in ERISA section 4219(c)(1)(C)(i)(II) refers to the absolute highest rate at which an employer had an obligation to contribute under a multiemployer pension plan even when the employer had multiple CBAs with the plan. Here, that amount is $3.69 per hour. (Def.'s 56.1 Stmt. ¶ 2; Pl.'s Resp. 56.1 Stmt. ¶ 2).

Woodbridge argues that the Court should avoid this interpretation—which ultimately requires Woodbridge to pay annual payments for twenty years that greatly exceed its previous maximum annual payment—because it is "absurd." (Def. Br. 20). The Court disagrees. "An interpretation is absurd when it defies rationality or renders the statute nonsensical and superfluous." *United States v. Fontaine*, 697 F.3d 221, 228 (3d Cir. 2012) (internal citations and quotation marks omitted); *see also* John F. Manning, *The Absurdity Doctrine*, 116 Harv. L. Rev. 2387, 2390 (2003) (noting that "standard interpretive doctrine . . . defines an 'absurd result' as an outcome so contrary to perceived social values that Congress could not have 'intended' it"). While interpreting ERISA section 4219(c)(1)(C)(i)(II) by its plain language may lead to a seemingly harsh result for Woodbridge in this particular case, Woodbridge has not cited to any binding or persuasive authority compelling this Court to conclude that construing the phrase "the highest contribution rate" literally would render the statute either nonsensical or superfluous.

The Court is guided by the Supreme Court's observation that "ERISA is a comprehensive and reticulated statute," and that courts should be "especially reluctant to tamper with the enforcement scheme embodied in the statute by extending remedies not specifically authorized by its text." *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 209 (2002) (internal

citations and quotation marks omitted).  The bright line rule Congress drafted in section

4219(c)(1)(C)(i)(II), requiring the use of the single "highest contribution rate," is part of

ERISA's "compressive and reticulated" scheme, as is the bright line rule in section

4219(c)(1)(B), which "limits the employer's obligation to make [annual withdrawal liability]

payments to [twenty] years, even if it would take more than [twenty] payments for the employer

to pay its full withdrawal liability." *Trs. of the Local 138 Pension Fund*, 692 F.3d at 130.  Just

because the application of these bright line rules sometimes leads to harsh outcomes does not

mean that courts may deviate from them whenever doing so seems fair.  *See Lamie v. United

States Trustee*, 540 U.S. 526, 538 (2004) (citation omitted) ("Our unwillingness to soften the

import of Congress' chosen words even if we believe the words lead to a harsh outcome is

longstanding."); *In re Visteon Corp.*, 612 F.3d 210, 219 (3d Cir. 2010) (citation omitted) ("The

words of a statute are not to be lightly jettisoned by courts looking to impose their own logic on a

statutory scheme").  Accordingly, as to this issue, the Court grants the Board's motion for

summary judgment and denies Woodbridge's motion.

     B.     <u>Whether Automatic Employer Surcharges are Included in a Pension Fund's
Calculation of an Employer's "Highest Contribution Rate"?</u>

     ERISA section 305(e)(7)(A) obligates an employer to pay an automatic surcharge to a

multiemployer pension plan that is in "critical status."  29 U.S.C. § 1085(e)(7)(A).  Depending

on how long the plan has been in critical status, the surcharge is equal to either five or ten

percent of the "contributions otherwise required under the applicable [CBA]."  29 U.S.C. §

1085(e)(7)(A).  At issue is whether ERISA section 4219(c)(1)(C)(i)'s formula for calculating a

withdrawing employer's annual withdrawal liability payment somehow accounts for an

automatic employer surcharge paid under ERISA section 305(e)(7)(A).

The Court's analysis "begins with the plain language of the statute." *Jimenez v. Quarterman*, 555 U.S. 113, 118 (2009) (citation omitted). As is relevant here, one of the variables in ERISA section 4219(c)(1)(C)(i)'s formula for calculating an employer's annual withdrawal liability payment is the employer's "highest contribution rate." 29 U.S.C. § 1399(c)(1)(C)(i)(II). Significantly, Congress did not define an employer's "highest contribution rate" as the "contributions" that the employer in fact made to the plan. Instead, as noted in Part III. A. of this Opinion, Congress defined an employer's "highest contribution rate" as that at which the employer had an obligation to contribute arising "under one or more [CBAs]" under the plan.[7] *See* 29 U.S.C. §§ 1392(a), 1399(c)(1)(C)(i)(II). Therefore, in order for an employer's "highest contribution rate" to include an automatic employer surcharge imposed by ERISA section 305(e)(7), the surcharge must likewise arise under the CBAs.

An automatic employer surcharge arises not under a CBA, but under ERISA section 305(e)(7) when the necessary conditions are met. Again, that section simply states that the value of an automatic employer surcharge, when applicable, is *informed* by the employer's CBAs; it does not magically amend the terms of those CBAs. *See* 29 U.S.C. § 1085(e)(7). The plain language of ERISA section 305(e)(7)(A) clarifies this point:

> Each employer *otherwise obligated to make contributions* for the initial critical year shall be obligated to pay to the plan for such year a surcharge equal to 5 percent of the *contributions otherwise required under the applicable [CBA]* (or other agreement pursuant to which the employer contributes). For each succeeding plan year in which the plan is in critical status for a consecutive period of years beginning with the initial critical year, the surcharge shall be 10 percent of the *contributions otherwise so required*.

---

[7] Alternatively, Congress defined an employer's "highest contribution rate" as that at which the employer had an obligation to contribute arising "as a result of a duty under applicable labor-management relations law." *See* 29 U.S.C. §§ 1392(a), 1399(c)(1)(C)(i)(II). The Board has not argued that automatic employer surcharges arise under such a law, and the Court is aware of none.

29 U.S.C. § 1085(e)(7)(A) (emphasis added); *see Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992) (citations omitted) ("We have stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what is says there."). Consequently, any variable in a calculation that is similarly informed by an employer's CBAs is unaffected by ERISA section 305(e)(7)'s imposition of an automatic employer surcharge. The "highest contribution rate" variable in ERISA section 4219(c)(1)(C)(i)(II) is one such variable. The Board raises four arguments in support of the proposition that a multiemployer pension plan's "highest contribution rate" includes automatic employer surcharges.

The first argument advanced by the Board is that ERISA section 305(e)(7)(B) establishes that automatic employer surcharges and contributions are the same thing under ERISA. (Pl. Br. 24-25). ERISA section 305(e)(7)(B) states that automatic employer surcharges are "due and payable on the same schedule as the contributions on which the surcharges are based. Any failure to make a surcharge payment shall be treated as a delinquent contribution under [ERISA section 515, 29 U.S.C. § 1145,] and shall be enforceable as such." 29 U.S.C. § 1085(e)(7)(B). However, the "contribution rates" set forth in an employer's CBAs with a multiemployer pension plan are distinct from the "contributions" that the employer generally pays to the plan. Although the contribution rates help determine the total value of the contributions, the contributions do not determine the contribution rates. Thus, even if contributions and surcharges were indeed the same thing, the underlying contribution rates contained in the CBAs would remain unchanged by the imposition of an automatic employer surcharge.

Second, the Board argues that ERISA section 305(e)(9)(B) requires the inclusion of automatic employer surcharges when determining an employer's annual withdrawal liability payment by negative implication. (Pl. Br. 25-28). That section provides:

22

> Any [automatic employer surcharges] shall be disregarded in determining the allocation of unfunded vested benefits to an employer under [ERISA section 4211, 29 U.S.C. § 1391], except for purposes of determining the unfunded vested benefits attributable to an employer under [ERISA section 4211(c)(4)] or a comparable method approved under [ERISA section 4211(c)(5)].

29 U.S.C. § 1085(e)(9)(B). The Board suggests that a multiemployer pension plan's calculations of both an employer's allocable amount of unfunded vested benefits and annual withdrawal liability payment are part of a common scheme. (Pl. Br. 25). Invoking the *expressio unius* canon,[8] the Board maintains that because ERISA section 305(e)(9)(B) generally requires multiemployer pension plans to disregard automatic employer surcharges when determining an employer's allocable amount of unfunded benefits, the plans should not disregard the surcharges when determining an employer's annual withdrawal liability payment. (Pl. Br. 26-27).

The *expressio unius* canon "is only a guide, whose fallibility can be shown by contrary indications that adopting a particular rule or statute was probably not meant to signal any exclusion of its common relatives." *Vonn*, 535 U.S. 55, 56 (2006); *see also Burns v. United States*, 501 U.S. 129, 136 (1991) ("An inference drawn from congressional silence certainly cannot be credited when it is contrary to all other textual and contextual evidence of congressional intent."). In this case, a comparison of ERISA sections 4211 and 4219 persuades the Court that Congress did not intend for ERISA section 305(e)(9)(B) to require the inclusion of automatic employer surcharges within an employer's "highest contribution rate" by negative implication.

---

[8] The *expressio unius* canon provides that the expression of one item of a commonly associated group excludes another left unmentioned. *United States v. Vonn*, 535 U.S. 55, 65 (2002); *see also Perlin v. Hitachi Capital Am. Corp.*, 497 F.3d 364, 370 (3d Cir. 2007) (citation omitted) ("[T]he expressed item and the unmentioned item should be understood to go 'hand in hand,' thus supporting a sensible inference that Congress must have meant to exclude the unmentioned item.")

23

ERISA section 4211 provides various methods for calculating an employer's allocable amount of unfunded vested benefits. *See* 29 U.S.C. § 1391(c)(1). Here, the method set forth in ERISA section 4211(c)(3), 29 U.S.C. § 1391(c)(3), applied. (*See* Markey Decl. Ex. B Art. XII, Sec. 12.03). A cursory review of ERISA section 4211(c)(3) supplies an explanation for Congress's decision to explicitly provide in ERISA section 305(e)(9)(B) that a multiemployer pension plan must disregard an employer's allocable amount of unfunded vested benefits.

ERISA section 4211(c)(3) provides that an employer's allocable amount of the unfunded vested benefits is the product of:

> (A) the plan's unfunded vested benefits as of the end of the plan year preceding the plan year in which the employer withdraws, less the value as of the end of such year of all outstanding claims for withdrawal liability which can reasonably be expected to be collected from employers withdrawing before such year; multiplied by
>
> (B) a fraction—
>
>> (i) the numerator of which is the *total amount* required to be contributed by the employer under the plan for the last 5 plan years ending before the withdrawal, and
>>
>> (ii) the denominator of which is the *total amount* contributed under the plan by all employers for the last 5 plan years ending before the withdrawal, increased by any *employer contributions* owed with respect to earlier periods which were collected in those plan years, and decreased by any amount contributed to the plan during those plan years by employers who withdrew from the plan under this section during those plan years.

29 U.S.C. § 1391(c)(3) (emphasis added). Had Congress not clarified in ERISA section 305(e)(9)(B) that automatic employer surcharges are to be disregarded from ERISA section 4211(c)(3)'s formula, Congress would have left unclear whether the surcharges are included

24

within that formula. Namely, because the variables in ERISA section 4211(c)(3)'s formula include the "total amount required to be contributed by the employer under the plan" and "employer contributions." 29 U.S.C. § 1391(c)(3).

In contrast, the variables in ERISA section 4219(c)(1)(C)(i)'s formula are "contribution base units," *e.g.*, hours or weeks worked,[9] and the "highest contribution rate at which the employer had an *obligation to contribute* under the plan . . . ." 29 U.S.C. § 1399(c)(1)(C)(i). Congress explicitly defined the term "obligation to contribute" as those arising "under or more collective bargaining (or related) agreements," or "as a result of a duty under applicable labor-management relations law." 29 U.S.C. § 1392(a). Therefore, Congress did not need to clarify that the "highest contribution rate" variable does not include automatic employer surcharges.

Third, the Board argues that a 2008 amendment to ERISA section 305(e)(9)(B) suggests that automatic employer surcharges are disregarded only for the purpose of determining an employer's allocable amount of unfunded vested benefits. (Pl. Br. 27-28). According to the Board, prior to 2008, ERISA section 305(e)(9)(B) stated in relevant part that "[a]ny surcharges . . . shall be disregarded in determining an employer's withdrawal liability under [ERISA] section 4211 . . . ." (*Id.* at 27). The Board notes that Congress amended ERISA section 305(e)(9)(B) in 2008 to state, as it now does, that "[a]ny surcharges . . . shall be disregarded in determining the allocation of unfunded vested benefits to an employer under [ERISA section 4211, 29 U.S.C. § 1391] . . . ." 29 U.S.C. § 1085(e)(9). Because Congress "had the opportunity to state that surcharges were to be disregarded in calculating an employer's withdrawal liability payment schedule and chose not to do so," the Board suggests that this Court must presume that surcharges are not to be disregarded in that calculation. (Pl. Br. 28).

---

[9] Contribution base units may refer to, among other things, "hours worked or weeks worked. *Findlay Truck Line, Inc. v. Cent. States, Se. & Sw. Areas Pension Fund*, 726 F.3d 738, 741 n. 1 (6th Cir. 2013).

The Board's third argument fails.  There is a more logical presumption that arises from Congress's amendment of ERISA section 305(e)(9).  *Cf. Stone v. Immigration & Naturalization Serv.*, 514 U.S. 386, 397 (1995) ("When Congress acts to amend a statute, we presume it intends its amendments to have real and substantial effect.").  Specifically, since ERISA section 4211 repeatedly speaks in terms of determining the "amount of unfunded vested benefits allocable to employer withdrawn from plan," it is presumable that Congress amended ERISA section 305(e)(9)(B) to match this language and eliminate any confusion.  *See* 29 U.S.C. § 1391.  This presumption is not far-fetched, given ERISA section 4201's statement that "[t]he withdrawal liability of an employer to a plan is the amount determined under [ERISA section 4211, 29 U.S.C. § 1391,] to be the allocable amount of unfunded vested benefits, *adjusted* [in accordance with other pertinent provisions of ERISA.]"  *See* 29 U.S.C. § 1381 (emphasis added).  In other words, an employer's withdrawal liability and allocable amount of unfunded vested benefits are not synonymous.  *See* 29 U.S.C. § 1381.

The Board's fourth and final argument invokes language in the Local Union No. 863 I.B.T. Restated Pension Plan.[10]  Specifically, the Board highlights the Restated Pension Plan's statement that Woodbridge had "the obligation to make Employer Payments to this Pension Plan, to the full extent of the law . . . ." (Pl. Reply Br. 5-6, ECF No. 42).  This statement, according to the Board, requires the inclusion of any applicable automatic employer surcharge in the "highest contribution rate." (*See id.*).  The argument advanced by the Board, however, conflates "Employer Payments," which the Restated Pension Plan defines as "payments owed or made by Contributing Employers to the Pension Plan as required by an agreement and/or the Agreement

---

[10] Although the Board has failed to point to any specific language in the CBAs that specifically incorporates the language that it relies on in the Restated Pension Plan, the Court nonetheless considers the Board's fourth argument in the interest of completeness.

and Declaration of Trust," with automatic employer surcharge payments that arise under ERISA section 305(e)(7)(A).  (Markey Decl. Ex. B Art. II, Sec. 2.18).  Finally, the Board's argument ignores that Woodbridge's contribution rates are set forth in the CBAs and nowhere else.  Thus, Woodbridge contention that "nothing in the plan or the CBAs incorporated the [automatic employer surcharges] into any of Woodbridge's contribution rates" is correct.  (Def. Br. 23).

The Court reiterates that ERISA Section 305(e)(7)(A)'s imposition of a ten percent automatic employer surcharge on Woodbridge's contributions to the Fund did not in any way alter the underlying contribution rates contained in Woodbridge's CBAs with the Fund.  Because those contribution rates remained the same, it was improper for Segal to account for the imposition of the surcharge when it determined Woodbridge's "highest contribution rate" under ERISA section 4219(c)(1)(C)(i)(II).  Here, that amount is $3.69 per hour.  (*See* Def.'s 56.1 Stmt. ¶ 2; Pl.'s Resp. 56.1 Stmt. ¶ 2).  Accordingly, as to this issue, the Court grants Woodbridge's motion for summary judgment and denies the Board's motion.

## IV.    CONCLUSION

For the reasons discussed herein, the Board's motion for summary judgment is granted in part and denied in part, and Woodbridge's motion for summary judgment is granted in part and denied in part.

DATED:  *19* of March, 2013.

JOSE L. LINARES
U.S. DISTRICT JUDGE